In the Matter of **MALLARD ASSOCI-ATES, A Limited Partnership.**

**No. 79 Civ. 3519 (LBS).**

United States District Court,
S. D. New York.

Aug. 30, 1979.

---

Trubin, Sillcocks, Edelman & Knapp, New York City, for Greenwich Sav. Bank; Lola S. Lea, New York City, of counsel.

Norman Klasfeld, New York City and Gerald & Lawrence Blumberg, New York City, Co-Counsel for debtor; Norman Klasfeld and Lawrence S. Blumberg, New York City, of counsel.

## OPINION

SAND, District Judge.

Greenwich Savings Bank ("Greenwich") appeals from the order of Bankruptcy Judge Joel Lewittes, dated June 14, 1979, denying Greenwich's motion to dismiss the petition on the grounds that the petition of Mallard Associates ("Mallard") was not filed in good faith and that as a matter of law, the petition must be dismissed because the only secured creditor has rejected the debtor's plan of arrangement. For the reasons hereinafter stated, the order is affirmed.

*Procedural History*

On October 25, 1978, Mallard filed a petition for an arrangement under Chapter XII of the Bankruptcy Act, 11 U.S.C. Sections 801 *et seq.* Greenwich, the only secured creditor of the property, moved for dismissal of the petition on the ground that it was not filed in good faith. The Bankruptcy Court, Lewittes, J., denied the motion and Greenwich appealed.

On appeal, Judge Carter vacated the order and remanded for a hearing on the issue of good faith.[1] Pursuant to that order, the Bankruptcy Court held an evidentiary hearing on February 12, 1979.

On February 15, 1979, Greenwich rejected Mallard's amended plan of arrangement. Greenwich then moved for dismissal on the ground that the sole secured creditor had rejected the arrangement. Judge Lewittes denied both motions. Greenwich appeals to this Court.

*Facts*

In October 1977, Greenwich instituted a proceeding in New York State Court to foreclose its mortgage on commercial property located at 45 West 45th Street, New York, New York. At the time of foreclosure, Mallard was not the owner of the subject property. Its two limited partners, Robert J. Hopkins and Benjamin Solomon, however, were major tenants of the premises.[2] In June 1977, several tenants, including Hopkins and Solomon, dissatisfied with the lack of maintenance being provided by the original owners, first discussed the possibility of purchasing the building. After the tenants received notice of the foreclosure in November 1977, these discussions intensified. The foreclosure proceeding was particularly threatening to the tenants because their lease reserved a right of attornment to the fee owner rather than the landlord. In the event of foreclosure, this clause gave both the fee owner and the foreclosure purchaser the right to terminate the existing leases. Hopkins then drafted a letter to the other tenants in the building, proposing that the tenants buy the building.

At this time, Solomon consulted with his accountant of over thirty years, Robert Gruber, about the prospect of purchasing the property. Gruber advised Solomon that in order for Solomon to take advantage of certain tax benefits, the entity which owned the property should be in the form of a limited partnership. Solomon relayed this advice to Hopkins, who agreed to it sometime in November–December 1977.

In late November 1977, Hopkins contacted Frank Fitzgerald, an employee of Greenwich, to inform him that some of the tenants were interested in purchasing the property. Hopkins met with Mr. Fitzgerald, and spoke with him on the telephone at least two times per week until March 1978. Mr. Fitzgerald expressed some interest in

1. *In re Mallard Associates*, 463 F.Supp. 1259 (S.D.N.Y.1978).

2. A company owned by Mr. Hopkins leased the entire thirteenth floor of the premises. A company owned by Mr. Solomon leased the entire store floor and mezzanine, a portion of the store basement, and a private passenger elevator.

Hopkins' proposals, but stated that Greenwich would prefer a proposal which contained fewer investors, investing a larger amount of money per person.[3]

Hopkins formally proposed the purchase of the property from Greenwich in a letter to Fitzgerald dated March 15, 1978. Greenwich rejected the proposal, stating that it had already made arrangements to sell the property to another party.

Hopkins and Solomon then decided to purchase the property from the fee owner. Hopkins and Solomon thought that in order to keep the price at a minimum and prevent Greenwich and its prospective purchaser from thwarting their efforts, it was imperative to keep their identities as purchasers secret. Hopkins and Solomon believed that the only way to protect their anonymity would be to form a corporation to purchase the property.

This corporation was formed and incorporated in July 1978 under the name 4545 Realty Corporation. Negotiations with the fee owners were conducted by Hopkins and Solomon's attorneys who were instructed not to reveal the identity of their clients. The deed was acquired by the corporation on September 5, 1978 for $10,000, subject to the existing mortgage of $1,003,000 and subject to arrears of interest, taxes, and other fees and expenses.

Although the parties agreed in late 1977 that the entity which owned the property would be a limited partnership, formation of this partnership was delayed because of a disagreement over whether the agreement would include a survivorship right and a first refusal to buy out. Two days after the purchase of the deed, Hopkins and Solomon, who had apparently settled their disagreement, instructed their attorneys to draft a limited partnership agreement. Under the terms of the agreement, 4545 Realty Corp. transferred the deed to the limited partnership (Mallard) in exchange for a 2% interest in the limited partnership, and became its general partner. Hopkins and Solomon became limited partners. The agreement was signed on September 29, 1978.

One day prior to the formation of the limited partnership, a meeting was held between Gerald and Lawrence Blumberg, representatives of Hopkins and Solomon and Benjamin Golub, a representative of SJK Realty, who had agreed to purchase the property from Greenwich upon foreclosure.[4] Hopkins and Solomon hoped to persuade SJK to allow them to either become partners of SJK, or take over SJK's right to purchase the deed in the event of foreclosure. At the hearing before Judge Lewittes, Mr. Golub testified that Gerald Blumberg stated at the meeting, that if SJK did not accept any of Hopkins and Solomon's proposals, "they would proceed in the Bankruptcy Court pursuant to a Chapter XII proceeding which would tie up the property for years to come. . . . and that my clients would not be able to acquire the property."[5] Despite Mr. Blumberg's warning, SJK rejected the proposals on October 20, 1978.

In a letter dated October 6, 1978, Mallard informed Greenwich that it was the new owner of the property. Mallard also requested that Greenwich provide it with information on the amount due on the mortgage for principal and interest, any arrearages on taxes and expenses, and fees, the amount of money collected by the receiver, and a copy of the contract to sell the property to SJK. Despite two letters from Mallard requesting response to the original letter, Greenwich never responded.

---

**3.** Even though Hopkins' proposals evidently envisioned more than two investors, it appears that at this time, Hopkins and Solomon were the only two definite investors. During the negotiation period, the other tenants who had expressed interest in purchasing the building, all decided not to join in the attempted purchase. Hopkins then placed an advertisement in the New York Times seeking outside investors, which also proved to be fruitless.

**4.** Also in attendance at this meeting were a Mr. Benjamin Bartel, an attorney, and his son Charles Bartel. The record, however, does not disclose the purpose of their appearances.

**5.** Transcript p. 71.

On October 25, 1978, the deed transferring the property from 4545 Realty to Mallard was recorded. On that same day, one day prior to the return date of Greenwich's motion for summary judgment in the foreclosure proceeding, Mallard filed its Chapter XII petition.

*Good Faith*

Chapter XII requires that a petition must be filed in good faith. 11 U.S.C., Section 872(4). On the initial appeal of this case, Judge Carter expressed the view that a petition is not filed in good faith where the debtor fraudulently invokes the jurisdiction of the Bankruptcy Court. *In re Mallard Associates, supra,* 463 F.Supp. at 1262. The opinion, however, did not provide a specific test for determining whether the debtor fraudulently invoked the jurisdiction of the Bankruptcy Court.[6]

■ On remand, Judge Lewittes applied the following test:

"The critical question must be whether the debtor here, in order to defraud its creditor, was 'organized and the property conveyed to it for the sole purpose of . . . utilizing the Chapter . . . [XII] proceeding.' "[7]

Opinion filed June 6, 1979, at 16. ("Opinion")

It is unclear from Greenwich's brief whether it takes exception to the test utilized by Judge Lewittes. In its brief, Greenwich quotes from the cases applying this test. Greenwich, however, also cites a line of cases in its brief which holds that a conveyance is illegal if it was made with the intent to hinder, delay, or defraud creditors.[8]

We hold that Judge Lewittes applied the correct test for determining whether Mallard filed its petition in good faith. This test has been applied by several courts where there has been an allegation of fraudulent invocation of the jurisdiction of the Bankruptcy Court under Chapter X.[9] We agree that it is also the proper test under Chapter XII.

The cases cited by Greenwich holding that a conveyance is illegal if it was made with the intent to hinder, delay or defraud creditors are inapplicable. In each of these cases, the court was deciding a question of state law rather than setting a standard of good faith under Chapter XII.

■ Applying this test to the facts of the instant case, Judge Lewittes concluded:

"Mallard has sustained its burden that it did not, on the eve of its Chapter XII filing, construct a 'strawman', i. e. Mallard, for the sole purpose of fulfilling the definitional requirements of a Chapter XII debtor[,] to then proceed under that in fraud of its creditor, Greenwich."

Opinion at 16. [Notes omitted].

We agree with the conclusion that Mallard acted in good faith. We arrive at this conclusion by reason of an analysis somewhat different in form, though perhaps not in substance, from that of Judge Lewittes. To determine whether Mallard has acted in good faith, we find we must examine two questions: 1) whether the original purchase of the deed by 4545 Realty was for the sole purpose of invoking the jurisdiction of the Bankruptcy Court; and 2) whether the

---

**6.** A second standard of good faith was applied in *In re Bolton Hall Nursing Home*, 432 F.Supp. 528, 530 (D.C.Mass.1977), where the court, employing a definition found in Chapter X, held that a petition is not filed in good faith if it " 'is unreasonable to expect that a plan of reorganization can be effected.' . . . 11 U.S.C. Section 546." Greenwich has not raised this issue, and Judge Carter specifically precluded its consideration at this stage of the proceeding. *In re Mallard Associates*, 463 F.Supp. at 1262.

**7.** Judge Lewittes quotes from *Mongiello Brothers Coal Corp. v. Houghtaling Properties, Inc.,*

309 F.2d 925, 930 (5th Cir. 1962), which is a case filed under Chapter X.

**8.** *Shapiro v. Wilgus,* 287 U.S. 348, 53 S.Ct. 142, 77 L.Ed. 355 (1932); *In re Collins,* 75 F.2d 62 (8th Cir. 1934). Judge Lewittes cited these cases in providing an overview on the law of good faith.

**9.** *In re Metropolitan Realty Corp.,* 433 F.2d 676 (5th Cir. 1970); *Mongiello Bros. Coal Corp. v. Houghtaling Properties, Inc., supra.; Milwaukee Postal Building Corp. v. McCann,* 95 F.2d 948 (8th Cir. 1938).

▮▮▮▮▮

transfer of the deed from 4545 Realty to Mallard was for the sole purpose of meeting the definitional requirements of Chapter XII.

We find that there is substantial evidence to support a finding that 4545 Realty did not purchase the property for the sole purpose of placing it in reorganization. All the efforts of Hopkins and Solomon were focused on the goal of securing ownership of the building. Subsequent to the purchase of the deed, representatives of Hopkins and Solomon met with representatives of SJK in an effort to assume SJK's right to purchase the property in the event of a foreclosure, or at least become partners of SJK in such a purchase.

Mallard also wrote to the bank seeking data which could be used to determine the feasibility of redemption of the mortgage. The letter requested the amount due on the mortgage for principal and interest, the amount of arrearages for taxes, fees and expenses, and the amount of money collected by the receiver. While Hopkins had some knowledge of this information from his negotiations with Fitzgerald to purchase the property, at least some of this information was solely in the possession of Greenwich. Greenwich did not respond to this letter, despite two requests from Mallard for a response. After six weeks of intense effort to retain ownership of the property by means other than an arrangement under Chapter XII, Mallard finally filed its petition when it became obvious that its attempts had failed.

Moreover, we conclude that the property was not transferred to Mallard for the sole purpose of meeting the definitional requirements of Chapter XII. In his opinion, Judge Lewittes found that "Mallard's formation as a limited partnership was contemplated well in advance of the filing [and] was grounded on sound business considerations." Opinion at 11.

▮▮ This finding is not clearly erroneous.[10] There is undisputed testimony that

Hopkins and Solomon, on the advice of Solomon's accountant, agreed well in advance of the filing that the entity which owned the deed would be a limited partnership. Both Hopkins and Solomon testified that the reason that the entity which purchased the deed was a corporation was to maintain the anonymity of the principals. Hopkins stated that he felt that this anonymity could not be maintained if the purchasing entity was a limited partnership. Moreover, both Hopkins and Solomon testified that the delay in the formation of the limited partnership was caused by the disagreement over whether the agreement would include a survivorship right and a right of first refusal to buy out.

Finally, we reject Greenwich's argument that:

"Mallard, having purchased the Property with the full knowledge of the foreclosure is estopped to complain of the foreclosure or to seek relief from its consequences under Chapter XII. Whether the analysis is in terms of estoppel to utilize Chapter XII or whether the analysis is in terms of good faith in the filing of the Chapter XII petition is immaterial since it is clear that the use made by Mallard of Chapter XII is not what was contemplated by Congress." Reply brief at 2.

Initially we note that the issue remanded to the Bankruptcy Court by Judge Carter, and the only issue before this Court on this appeal, is whether the petition is filed in good faith, and not a question of estoppel. In any event, we find no merit in Greenwich's argument. First, in every case cited by Greenwich in support of this argument, there was a finding that the sole purpose of the transfer was to meet some definitional requirement of the Bankruptcy Act. As stated above, this is not the case here.

▮▮ Second, the definition of "debtor" under Chapter XII is "deliberately broad." *In re Epps*, No. 78–247 (S.D.N.Y. March 15,

10. On review Judge Lewittes' finding cannot be set aside unless it is clearly erroneous. *In re Bermec Corp.*, 445 F.2d 367 (2d Cir. 1971).

1978) (Motley, J.). While the purchasing of property subject to foreclosure is evidence of a lack of good faith, it is not dispositive. Hopkins and Solomon, the principals of Mallard, were tenants in the subject premises who were facing eviction from the foreclosure. To prevent losing their substantial investment in · their leaseholds, they purchased the property and sought to reach a compromise with either Greenwich or SJK which would avoid the harsh consequences of the foreclosure.

■ One of the most important purposes of Chapter XII is to allow the debtor to restructure his debts, so that he can pay his creditors, while retaining his property. See *In re Colonial Investment Co.*, 516 F.2d 154 (1st Cir. 1975); *In re Dick*, 296 F.2d 912 (7th Cir. 1961). So long as an entity which purchases property subject to foreclosure makes a bona fide effort to reach such a settlement with the mortgagee before resorting to a Chapter XII petition, we see no reason to penalize the purchaser whose bona fide effort has failed. This is especially true where the mortgagee turns a deaf ear to the debtor's attempts at reaching a settlement.

Judge Lewittes considered the circumstances surrounding the purchase of the property in making his finding of good faith. After considering the evidence in the record on appeal, and the briefs of both sides, we agree with Judge Lewittes' finding on this issue.

*Rejection by the sole secured creditor*

Greenwich also argues that the petition must be dismissed on the ground that, as a matter of law, a plan of arrangement cannot be confirmed when it has been rejected by the sole secured creditor. In support of its argument, Greenwich cites a line of cases which hold that a Chapter XII arrangement cannot be confirmed over the unanimous objection of the secured creditors.[11] Thus, even though Mallard has not moved to confirm the arrangement, Greenwich argues that dismissal is proper at this stage.

Specifically, Greenwich contends that Section 468 of the Bankruptcy Act requires that an arrangement, which has not been unanimously approved by the creditors, may only be confirmed if it has been accepted by "the creditors of each class, holding two-thirds in the amount of debts of such class affected by the arrangement." 11 U.S.C. Section 868.[12] Greenwich argues that since it is the only creditor the requisite two thirds majority can only be obtained if it approves the plan. Otherwise, it argues, the action must be dismissed.

Under Greenwich's analysis, the debtor cannot resort to Section 461(11) of the Bankruptcy Act (11 U.S.C. Section 861(11) to "cram down" the arrangement.[13] Green-

---

**11.** *Gardens of Cortez v. John Hancock Mutual Life Insurance Co.*, 585 F.2d 975 (10th Cir. 1979); *Taylor v. Wood*, 458 F.2d 15 (9th Cir. 1972); *Meyer v. Rowan*, 195 F.2d 263 (10th Cir. 1952); *In re Herwig*, 119 F.2d 941 (7th Cir. 1941); *Kyser v. MacAdam,* 117 F.2d 232 (2d Cir. 1941); *In re Hamburger*, 117 F.2d 932 (6th Cir. 1941); *In the Matter of Georgetown Apartments*, 468 F.Supp. 844 (M.D.Fla.1979); *In re Schwab Adams Apartments Co.*, 463 F.Supp. 8 (S.D.N.Y.1979 Carter, J.); *In re Spicewood Associates*, 445 F.Supp. 564 (N.D.Ill.1977); *In re West Hudson Co.*, 78 B 390 (S.D.N.Y. July 27, 1978) (Bankruptcy Court).

**12.** 11 U.S.C. Section 868 provides:
If an arrangement has not been so accepted, an application for the confirmation of an arrangement may be filed with the court within such time as the court shall have fixed in the notice of such meeting, or at or after such meeting and after, but not before—

(1) it has been accepted in writing by the creditors of each class, holding two-thirds in amount of the debts of such class affected by the arrangement proved and allowed before the conclusion of the meeting, or before such other time as may be fixed by the court, exclusive of creditors or of any class of them who are not affected by the arrangement or for whom payment or protection has been provided as prescribed in paragraph (11) of section 861 of this title; and
(2) the deposit required under this chapter and under the arrangement has been made.

**13.** 11 U.S.C. Section 861(11) provides that an arrangement: "shall provide for any class of creditors which is affected by and does not accept the arrangement by the two-thirds majority in amount required under this chapter, adequate protection for the realization by them of the value of their debts against the property dealt with by the arrangement and affected by

wich contends that there must be the requisite two thirds majority accepting under Section 468 before Section 461(11) can be applied. Thus, a plan rejected by the sole secured creditor cannot fulfill the requirement of Section 468, and Section 461(11) is never reached.

Judge Lewittes rejected Greenwich's argument and adopted the position of Bankruptcy Judge Babitt. Judge Lewittes ruled:

> "In my judgment, the reasoning and analysis of Bankruptcy Judge Babitt as set forth in the opinions in [In re] Marietta Cobb Apartments, . . . and [In re] KRO Associates, . . . permitting confirmation of a Chapter XII plan by the debtor's resort to Section 461(11) of the Act, over the objection of the single secured creditor, must carry the day." Opinion at 18–19.

We agree with Judge Lewittes. Chapter XII does not specifically address the question of a sole creditor. Courts have, however interpreted the Bankruptcy Act to permit confirmation of an arrangement over the objection of a single creditor. See In re Hobson Pike Associates, 15 C.B.C. 346 (N.D. Ga.1977) (Bankruptcy Court); In re Marietta Cobb Apartments Co., 14 C.B.C. 503 (S.D. N.Y.1977) (Bankruptcy Court).[14] Generally, Section 468 requires approval of a plan by a two thirds majority of the affected creditors. In lieu of the two thirds majority, however, the debtor may apply " 'for confirmation of the arrangement' by the involuntary application of Section 461(11) to provide adequate protection to the creditor." In re Hobson Pike Associates, supra, 14 C.B.C. at 356.

Initially, we note that on its face Section 461(11) does appear to require a two thirds acceptance before an arrangement can be crammed down. Thus, as Greenwich argues, a plan cannot be confirmed over the objection of the sole secured creditor because there are no other creditors affected by the plan who could accept. This argument, however, as Judge Babitt points out, produces an absurd result:

> "It is also illogical . . . that Section 461(11) may be utilized where a secured creditor rejects a plan and there are unsecured creditors who do not accept the plan, but not where the sole secured creditor rejects a plan, and no unsecured creditors affected by the plan exist. This result is particularly absurd because:
>
> " '. . . it is not terribly difficult for the enterprising real estate debtor to incur other creditor obligations, perhaps even resulting in secondary and mechanics or materialmen's liens on the property. The reorganization plan can propose payment of all or part of these claims in cash, assuring the favorable votes of those classes.' " Lifton, Real Estate in Trouble, 31 Bus.Law, 1927, 1968 (1976).

In re Marietta Cobb Apartments, supra, 14 C.B.C. at 514; see also In re Hobson Pike Associates, supra, 15 C.B.C. at 357.

We find further support for our interpretation in the legislative history of Chapter XII. The cram down provision was included in Chapter XII because under Section 74 of the old Bankruptcy Act, a debtor was unable to bind an objecting secured creditor to an arrangement. Thus, most

---

such debts, either as provided in the arrangement or in the order confirming the arrangement, (a) by the transfer or sale, or by the retention by the debtor, of such property subject to such debts; or (b) by a sale of such property free of such debts, at not less than a fair upset price, and the transfer of such debts to the proceeds of such sale, or (c) by appraisal and payment in cash of the value of such debts; or (d) by such method as will under and consistent with the circumstances of the particular

case, equitably and fairly provide such protection."

This provision is colloquially referred to as the "cram down" provision because it may be invoked to compel a creditor to be bound by an arrangement which the creditor is otherwise unwilling to accept.

14. See also In re KRO Associates, 17 C.B.C. 658 (S.D.N.Y.1978) (Bankruptcy Court); In re Pine Gate Associates, Ltd., 10 C.B.C. 581 (N.D. Ga.1976) (Bankruptcy Court).

real property arrangements ended in foreclosure.[15]

█ Congress intended that this provision be applied liberally. When faced with the problem of courts narrowly construing the confirmation procedures of Chapter XII, Congress in 1952 amended Section 472 of the Bankruptcy Act (11 U.S.C. Section 872). This amendment removed the "fair and equitable test" from Chapter XII. Under the "fair and equitable test," courts had held that creditors had to be paid in full before the debtor was permitted to retain possession of its property.[16] Such an interpretation made section 461(11) unavailable to the debtor and caused Chapter XII cases to end in foreclosure.

Without the constraints of the "fair and equitable test," Congress intended that a debtor could retain an interest even if the objecting creditors are not paid in full, provided that they are given adequate protection. Thus, we find that Congress intended that the key to confirmation is whether the objecting creditors receive adequate protection. If this is so, the debtor can move for confirmation over the objection of the sole secured creditor.

Moreover, the cases cited by Greenwich do not mandate a contrary result. There are only two cases in which courts refused confirmation of an arrangement because of the objection of the sole secured creditor. One of the cases, *Meyer v. Rowen*, 195 F.2d 263 (10th Cir. 1952) relies on *In re Herwig*, 119 F.2d 941 (7th Cir. 1941). In that case, the court based its decision on the belief that Section 481 of the Bankruptcy Act (11 U.S.C. 881) required dismissal of an action if no arrangement is accepted by the creditors. Section 481, however, has been held to be discretionary and should only apply "where a debtor cannot provide adequate protection and cannot provide a plan that is feasible and in the best interests of creditors." *In re Marietta Cobb Apartments Co., supra*, 14 C.V.C. at 514. Moreover, Bankruptcy Rule 12–41, which was approved in 1976, specifically allows for continuance of a Chapter XII case despite rejection of the arrangement. Additionally, the *Herwig* court was under the influence of the absolute priority rule, which, as stated above, was repealed in 1952. In the other case, *Taylor v. Wood*, 458 F.2d 15 (9th Cir. 1972), the creditor was not provided adequate protection.

We believe this issue presents an exceedingly close question. We recognize the fact that the precedents followed by Judge Lewittes are based in large part on policy arguments which do not survive the Revised Bankruptcy Act, which goes into effect on October 1, 1979. Dealing with the present statute, however, it is our opinion that the holding below on this issue is correct. Moreover, another consideration reinforces the conclusion that the petition should not now be dismissed.

█ Even if we accepted Greenwich's contention that the arrangement proposed by the debtor could not be confirmed, we would not dismiss the action. Inability to confirm a particular plan of arrangement does not require dismissal of the entire Chapter XII action. See Bankruptcy Rule 12–41 and Advisory Committee's Note. While a debtor may not unreasonably delay dismissal of an action by submitting successive arrangements, the Bankruptcy Court should provide him a fair opportunity for the submission of a plan which satisfies the requirements of Chapter XII, and can be approved by the creditor. See *Owners of "SW8" Real Estate v. McQuaid*, 513 F.2d 558 (9th Cir. 1975); *Rader v. Boyd*, 267 F.2d 911 (10th Cir. 1959). Therefore, an action under Chapter XII should not be dismissed where there is a reasonable possibility that an arrangement can be confirmed.

15. See Gilbert and Massari, *Chapter XII "Cram-down"—Bad Medicine or Just Desserts?*, 52 Am.Bankr.L.J. 99, 105 and authorities cited therein.

16. To insure that courts did not interpret the absolute priority rule into Section 472, Congress included the following: "Confirmation of an arrangement shall not be refused solely because the interest of the debtor will be preserved under the arrangement." See also H.R. Rep. No. 2320, 82d Cong., 2d Sess. 21, *reprinted in* 1952 U.S.Code Cong. & Admin.News, pp. 1960, 1981–82.

We cannot conclude on the record before us that there is no reasonable possibility of confirmation of a plan. Moreover there is evidence that Greenwich itself believes that an arrangement can be confirmed in this case. Subsequent to Judge Lewittes' opinion, Greenwich submitted its own plan of arrangement.

The issue on this appeal is not which plan is to be accepted or whether Greenwich would in fact be adequately protected if it were to be compelled to accept this or any "cram down." Rather, the issue is whether the Chapter XII proceedings should be allowed to continue because some possibility exists that they be purposeful and may achieve the objective which Chapter XII was intended to serve.

*Conclusion*

Accordingly, we affirm the opinion of Judge Lewittes denying Greenwich's motion to dismiss the action. We find that the petition was filed in good faith. We hold that an arrangement may be confirmed over the objection of the sole secured creditor. However, even if the debtor plan could not be confirmed, we would not dismiss the action because there is a reasonable possibility that some plan of arrangement can be confirmed.

So ordered.